

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WESLEY EDWARD SMITH, III,
       Plaintiff,

v.                              Civil Action No. 3:08cv800

COMMONWEALTH OF VIRGINIA, et al.,
       Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the MOTION TO DISMISS of Defendants Commonwealth of Virginia, Governor Timothy Kaine, James V. Ingold, and the Virginia State Board of Elections ("the Board") (Docket Number 42), the MOTION TO DISMISS of Robert Dybing (Docket Number 36), and the MOTION TO DISMISS of Defendant J. Kirk De Courcey Showalter (Docket Number 40). For the reasons set forth below, all three motions to dismiss will be granted.

### I. FACTS

Wesley Edward Smith, III, the Plaintiff, is an African-American resident of Richmond, Virginia. (Third Am. Compl. at ¶ 2.[1]) Smith is not a felon, nor has he been divested of his

_____

[1] Smith is proceeding pro se in this matter. Therefore, the Court will liberally interpret all of his filings and evidentiary

voting rights in any other way. (<u>Id.</u>)  On or about October 2 and 3, 2008, Smith attempted to register to vote in the 2008 elections.[2] (<u>Id.</u> at ¶¶ 3-4.)  Smith was denied on both attempts. (<u>Id.</u>) Smith alleges that these denials were motivated by his race. (<u>Id.</u> at ¶ 9.) Smith reported to his assigned voting precinct on November 4, 2008, but was denied the opportunity to vote because he had not successfully registered. (<u>Id.</u>)

Smith filed a petition in the Circuit Court of the City of Richmond alleging that the denial of his registration was based on racial animus.  On December 10, 2008, a hearing on Smith's petition was held in the Circuit Court and, thereafter, the Circuit Court denied Smith's petition, because he had incorrectly completed the requisite voter registration forms. (Dybing Mem. at Ex. 1)

On December 8, 2008, Smith attempted to file a complaint in this Court.  By Order dated January 9, 2009, the Court ordered Smith to file an amended complaint because the one that he had filed failed to state a legal claim on which relief could be

proffers where possible. <u>See</u> <u>Estelle v. Gamble</u> 429 U.S. 97, 106 (1976) (<u>pro</u> <u>se</u> documents are to be liberally construed); <u>Noble v. Barnett</u>, 24 F.3d 582, 587 n.6 (4th Cir. 1994) (holding same).

[2] The dates of Smith's attempts to register are disputed by the parties, with the Defendants claiming that the attempts were made on October 1 and 2, 2008, but those dates are not material to the resolution of any substantive issue and therefore the dispute need not be addressed.

2

granted. (See Order dated January 9, 2009 (Docket Number 5).) Smith filed his first Amended Complaint on the same day, and a Second Amended Complaint on February 4, 2009. All Defendants filed motions to dismiss for various reasons. After an initial pretrial conference at whith the Defendants and the Court explained to Smith the asserted grounds for dismissal, the Court dismissed Smith's two amended complaints without prejudice and allowed him to file a Third Amended Complaint. (Order dated May 5, 2009 (Docket Number 33).)

Smith filed his Third Amended Complaint asserting claims under 42 U.S.C. § 1983 (§ 1983) for violations of: the Fifteenth Amendment (Third Am. Compl. at ¶ 8); the prohibition on violating and conspiring to violate an individual's rights under 18 U.S.C. §§ 241 and 242 (Id. at ¶¶ 10, 11); and, the prohibitions on involuntary servitude and forced labor found in 18 U.S.C. §§ 1584 and 1589 (Id. at ¶¶ 12, 13). In the Third Amended Complaint, Smith also asserts that Virginia's registration system violates his rights, and the rights of African-Americans generally, under § 2 of the Voting Rights Act of 1965 by diluting their voting strength and denying them access o the political process.[3] (See id. at ¶¶ 14-15)

---

[3] Smith also attempts to enforce the rights set forth in the Voting Rights Act through § 1983, as well. However, it is well-

All of the Defendants have filed motions to dismiss based on Fed. R. Civ. P. 12(b)(1) and (b)(6), which Smith has opposed.[4] For the reasons set forth below, the motions to dismiss will be granted.[5]

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. The Court must take all factual allegations made in the complaint as true, and draw all reasonable and favorable inferences from those facts. Eastern Shore Markets, Inc v. JD Associates Ltd. Partnership, 213 F.3d 175, 180 (4th Cir. 2000). In order to survive a Rule 12(b)(6)

---

settled that a plaintiff cannot use § 1983 to enforce a Voting Rights Act claim. See Moseley v. Price, 300 F.Supp.2d 389, 396 n.11 (E.D.Va. 2004) (citing Middlesex County Sewerage Authority v. Nat'l Sea Clammers Assoc., 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)). Smith's Voting Rights Act claims, therefore, will be evaluated as free-standing claims pressed under that statute. To the extent that Smith intends to advance such claims under § 1983, they will be denied.

[4] Smith has submitted two documents in opposition, one of which is labeled as a Motion for Summary Judgment and the other as a Motion to Strike. (See Docket Nos. 54, 55.) The Court will construe these documents as simply being memoranda in opposition to the various motions to dismiss, as is appropriate based on their content.

[5] The dismissal of Smith's Third Amended Complaint means that he is not the prevailing party in this action for purposes of 42 U.S.C. § 1988, and his request for attorneys' fees under that section is therefore denied.

4

motion, a pleading need not contain "'detailed factual allegations' but [Rule 8] demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. ___, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)). "A pleading that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. The Iqbal/Twombly standard applies to pro se litigants as well as represented parties, with the caveat that, as always, pro se pleadings are to be liberally construed. See Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008); Thigpen v. McDonnell, 273 Fed.Appx. 271, 273 (4th Cir. 2008).

The Fourth Circuit, applying the Twombly standard, has emphasized that the complaint must "allege' enough facts to state a claim for relief that is *plausible* on its face.'" Giarratano, 521 F.3d at 302 (emphasis in original) (quoting Twombly, 127 S.Ct. at 1974). In deciding the motion, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Id. (quoting Eastern Shore Markets, 213 F.3d at 180).

5

## B. Sovereign Immunity

Section 1983 of Title 42 of the United States Code ("§ 1983") provides that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Eleventh Amendment immunizes states from suits brought in federal court, absent waiver from the state or a clear, constitutionally-permissible congressional exercise of its power to authorize the immunity under the Fourteenth Amendment. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). This immunity precludes plaintiffs from bringing suits against states or state officials acting in their official capacities Id. at 71. Therefore, Smith's § 1983 claims against the Commonwealth of Virginia, Governor Kaine, in his official capacity, Mr. Ingold, in his official capacity, and Ms. Showalter, in her official capacity, will be dismissed on this basis.

Similarly, state departments and agencies considered to be "arm[s] of the state" are not amenable to suit under § 1983

6

because they share the state's immunity. See Mt. Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 280 (1977). Determining whether a state agency is an arm of the state requires a two-step analysis; first, the court must determine whether "the "State treasury will be called upon to pay a judgment against a governmental entity." Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002). If that is the case, then the state's sovereign immunity extends to the agency and the analysis can cease, while "[a] finding to the contrary weighs against immunity." Id.

If the state treasury will not be used to pay any award, the court must next determine "if the relationship of the entity with the state is close enough to implicate the dignity of the State as a sovereign." Id. (internal quotations omitted). Three considerations are relevant to this analysis: "1) the degree of control that the State exercises over the entity; 2) whether the entity deals with local rather than statewide concerns; and 3) the manner in which State law treats the entity." Id. (internal quotations omitted).

The Third Amended Complaint does not specifically seek monetary damages. However, it contains a prayer for an award of "other relief," which could encompass such damages, in theory. Furthermore, Smith has vacillated on his intent to seek monetary

7

damages: his original Complaint does not contain such a demand, but his First and Second Amended Complaints both request compensatory damages.

If it is Smith's intent to recover damages then, under the Kitchen test, the Commonwealth's Eleventh Amendment immunity clearly would extend to the Board. The Board is a state-level supervisory agency created by state statute to oversee local election boards and ensure uniformity in election practices across election districts. See Va. Code Ann. § 24.2-103, -105. Board members are appointed by the Governor, as part of his official duties, and the Secretary of the Board is paid a salary from the state coffers. See id. § 24.2-102. The Board may bring certain types of actions in state courts in its own name, but, unlike regional jail authorities or municipalities, there is no provision in the creating statute allowing the Board to be sued in its own name or to establish and maintain its own finances. See id. at § 24.2-103(C); Kitchen, 286 F.3d at 184 (discussing Va. Code Ann. § 53.1-95.7(11)). Therefore, any money judgment against the Board would be paid from the state treasury, and the Commonwealth's immunity would extend to the Board. See Kitchen, 286 F.3d at 184.

Even if Smith does not seek money damages,, the Board satisfies the second line of analysis set forth in Kitchen. See

8

id.   The Board is under a significant amount of state control: its members are appointed by the Governor with the consent of the legislature; its duties and activities are tightly circumscribed by statute; the extramural political activities of Board members are limited by statute; and, the discretionary powers of the Board are limited. See Va. Code Ann. at § 24.2-102-105.2.   Indeed, the Fourth Circuit previously has found that the State sufficiently controlled local election boards for Eleventh Amendment immunity to extend to the boards. See McConnell v. Adams, 829 F.2d 1319, 1327-28 (4th Cir. 1987).

The second factor - whether the agency deals in statewide or local concerns - also weighs in favor of the extension of immunity. See Kitchen, 286 F.3d at 184.   The purpose of the Board is to "supervise and coordinate the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections."   Va. Code Ann. § 24.2-103(A).   Thus, the Board has, as its purpose, state-level oversight.

The final factor - the manner in which State law treats the entity - clearly weighs in favor of the extension of immunity. See Kitchen, 286 F.3d at 184.   "In addressing this factor, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize

9

the entity, and the holdings of state courts on the question." Maryland Stadium Authority v. Ellerbe Becket Inc., 407 F.3d 255, 265 (4th Cir. 2005) (internal quotations omitted).  State law treats the Board as a state-level agency tasked with overseeing local concerns and compiling and maintaining information. See Va. Code Ann. § 24.2-103.  Unlike regional jail authorities, the Board is a creature of the state, not of a coalition of municipalities. See Kitchen, 286 F.3d at 184.  Therefore, all four of the Kitchen factors favor extending the Commonwealth's immunity to the Board, and, for that reason, Smith's § 1983 claims against the Board will be dismissed.

## C. Sufficiency of Allegations

### 1. § 1983 Claims

The final argument made by the Defendants is that Smith has not pled sufficient facts in order to sustain his claims. (Showalter Mem. at 4-5; Dybing Mem. at  Commonwealth Mem. at 4.) A plaintiff must allege and prove three elements in order to succeed on a § 1983 claim:  "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." Jenkins v. Medford, 119 F.3d 1156, 1159-160 (4th Cir. 1997).  It is certainly true that Smith has rights, guaranteed by the

10

Fifteenth Amendment, to be free from racially discriminatory voting practices. See U.S. Const. amend. XV, § 1.

The core of Smith's allegation of a violation of these rights is that he was denied the right to register to vote based on his race. (Third Am. Compl. at ¶ 9.) Smith, however, alleges no facts supporting that allegation; indeed, he has offered nothing more than "labels and conclusions." See Iqbal, 129 S.Ct. at 1949; (Id.) In essence, Smith asserts only that "the motivation [sic] factor for the action was based on the plaintiff [sic] race (African American)." (Third Am. Compl. at ¶ 9.) But, Smith has articulated no other facts that even remotely suggest that his race was the basis for the denial of his voter registration. His entire claim of a violation of his rights rests on the inference that, because he is African-American and his voter's registration was denied, it must be the case that the former fact caused the latter. (See Third Am. Compl. at ¶¶ 3-5, 7-9.) Nor has Smith put forth any factual allegations indicating the presence of a conspiracy to violate his right to vote (the alleged violation of 18 U.S.C. §§ 241 and 242) or to subject him to involuntary servitude (the alleged violation of 18 U.S.C. § 1584) or forced labor (the alleged violation of 18 U.S.C. § 1589).

11

This is the very sort of pleading that the Supreme Court condemned as inadequate in Twombly. See 127 S.Ct. at 1974. Smith has alleged no facts that plausibly construct a claim that his voting rights were abridged because of his race. His § 1983 claims must be dismissed, because he has not alleged sufficient facts to show a deprivation of a federal constitutional or statutory right. See id.; see also Moseley, 300 F.Supp.2d at 396-97 (dismissing § 1983 claims when allegations were insufficient to establish a violation of constitutional rights). Even under a liberal construction, as is proper given Smith's pro se status, Smith has simply not pled sufficient facts to make his claim plausible. See Iqbal, 129 S.Ct. at 1949; Giarratano, 521 F.3d at 304 n.5.

Furthermore, several of Smith's § 1983 claims are based on what he alleges are statutory rights created by four criminal statutes, 18 U.S.C. §§ 241, 242, 1584 and 1589. (See Second Am. Compl. at 4-6.)  As an initial matter, "criminal statutes do not ordinarily create individual rights" that are enforceable under § 1983. See Doe v. Broderick, 225 F.3d 440, 447-48 (4th Cir. 2000).  The Supreme Court has created a three-part test for the determination of whether a federal statute creates a actionable right for purposes of § 1983: "Did Congress intend the statutory provision to benefit plaintiff? Is the ostensible right so

12

"vague and amorphous" that its enforcement would prove difficult? And, is the statutory provision at issue phrased in mandatory rather than discretionary terms?" See id. (citing Blessing v. Freestone, 520 U.S. 329, 340-41 (1997).

While the sections at issue are certainly mandatory rather than precatory, and create well-defined limitations on the scope of lawful conduct, nothing in any of the statutes appears to overcome the presumption that criminal statutes are passed for the benefit of the public at large, rather than a well-defined group. See id. (citing California v. Sierra Club, 451 U.S. 287, 294 (1981)). Therefore it is not permissible to infer any private right of action from those statues. See id. at 448. Smith's § 1983 claims respecting alleged violations of 18 U.S.C. §§ 241, 242, 1584, and 1589, therefore, could rightly be dismissed on that basis, as well.

### 2. Voting Rights Act Claims

As noted above, § 1983 is an inappropriate vehicle through which to pursue claims under the § 2 of the Voting Rights Act of 1965. See Moseley, 300 F.Supp.2d at 396 n.11. Therefore, a slightly different, though somewhat overlapping, analysis is necessary to determine the sufficiency of Smith's allegations respecting a violation of that act.

13

§ 2 of the Voting Rights Act of 1965 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race." 42 U.S.C. § 1973(a). "The 1982 amendment made clear that Section 2 condemns not only voting practices borne of a discriminatory intent, but also voting practices that operate, designedly or otherwise, to deny equal access to any phase of the electoral process for minority group members." United States v. Charleston County, S.C., 365 F.3d 341, 345 (4th Cir. 2004). Therefore,

> [a] violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

There are, in essence, two methods by which a state might violate § 2: vote denial and vote dilution. See Johnson v. Governor of State of Florida, 405 F.3d 1214, 1228 n.26 (11th Cir. 2005). "A vote dilution claim alleges that a particular

14

practice operates to cancel out or minimize the voting strength of a minority group." Hall v. Virginia, 385 F.3d 421, 427 (4th Cir. 2004)(internal quotations omitted). To make out a vote dilution claim, the plaintiff must:

> "(1) 'demonstrate that [the minority group] is sufficiently large and compact to constitute a majority in a single member district,' (2) 'show that [the minority group] is politically cohesive,' and (3) 'demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.'"

Id. at 426 (quoting Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986)). These three requirements are the heart of a vote dilution claim. See id. at 431-32. After establishing these three prerequisites, the plaintiff must then establish that, under the totality of the circumstances, the minority group has been denied the opportunity to participate in the political process and elect representatives of its choice. See Charleston County, 365 F.3d at 345.

Smith alleges that the voter registration process used by the state of Virginia has the effect of diluting African American voting strength. (Third Am. Compl. at ¶ 14.) Smith has pled no facts that even address the three prerequisite vote dilution factors, nor has he identified any way in which Virginia's registration system has deprived African-Americans of

15

their ability to participate in the electoral system or elect candidates of their choice. Therefore, his vote dilution claim, being purely conclusory, must be dismissed. See Hall, 385 F.3d at 431-32 (dismissing vote dilution claim when plaintiffs failed to establish prerequisite factors).

While the majority of modern § 2 claims deal with so-called "vote dilution," § 2 also applies to claims of "vote denial," which occurs when "a state employs a standard, practice, or procedure that results in the denial of the right to vote on account of race." See Johnson, 405 F.3d at 1228 n.26; see also White-Battle v. Moss, 222 Fed.Appx. 304, 305-06 (4th Cir. 2007) (briefly addressing a vote denial claim made under § 2). Therefore, Smith could successfully allege a violation of § 2 if he could demonstrate, by a totality of the circumstances, that the application of the Commonwealth's registration requirements were denying the African-American population of the Commonwealth (or some subdivision thereof) the opportunity to participate in the electoral process and elect representatives of their choice, whether or not such discrimination was intended. See Charleston County, 365 F.3d at 345; see also Chisom v. Roemer, 501 U.S. 380, 397 (1991) ("[A]ll [§ 2] claims must allege an abridgment of the opportunity to participate in the political process *and*

16

to elect representatives of one's choice.")(emphasis in original).

Under this formation of a vote denial claim, Smith's claim to that effect must be dismissed. Smith has made no factual allegations supporting his conclusion that his voter registration was denied because he is African-American. (See Third Am. Compl. at ¶¶ 9, 16.) Similarly, Smith has made no factual allegations supporting a conclusion that the Commonwealth's registration requirements are applied differently to African-Americans than to other ethnic groups. (See id.) Furthermore, Smith has made no factual allegations supporting an inference that the Commonwealth's registration requirements have the effect of denying African-Americans the right to vote in general. (See id.) Finally, Smith has made no factual allegations that the Commonwealth's registration requirements, or the application thereof, are preventing African-Americans from electing candidates of their choice. (See id.) Therefore, Smith has not set forth sufficient factual allegations to make his § 2 vote denial claim plausible; as such, his Voting Rights Act claims must be dismissed. See Iqbal, 129 S.Ct. at 1949.

## D. Rooker-Feldman

All Defendants also argue that Smith's suit is barred by the Rooker-Feldman doctrine based on the adjudication of his

17

claim in state court. (Showalter Mem. at 3; Dybing Mem. at 3; Commonwealth Mem. at 3.) The foregoing analyses have made it unnecessary to consider this additional argument for dismissal, but, in the interest of judicial efficiency, it is proper to do so.

The Rooker-Feldman doctrine is a jurisdictional limitation on lower federal courts, intended to ensure that they do not undertake inappropriate appellate review of state court judgments. See Davani v. Virginia Dept. of Transp., 434 F.3d 712, 716-17 (4th Cir. 2006). In 2005, the Supreme Court severely limited the scope of this doctrine, holding that

> The Rooker-Feldman doctrine ... is confined to cases of the kind from which the doctrine acquired its name: cases brought by state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.

Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284 (2005).

The Rooker-Feldman doctrine removes jurisdiction from the federal court in the limited circumstance where "the injury complained of [was] caused by the state court decision itself; it cannot be simply a prior injury that the state court failed to remedy." Field Auto City, Inc. v. General Motors Corp., 476 F.Supp.2d 545, 551 (E.D.Va. 2007); see also Sartin v. Macik, 535

F.3d 284, 287 n.1 (4th Cir. 2008) ("the Rooker-Feldman doctrine only bars collateral attacks on state court judgments."). Causation is the central issue in the new Rooker-Feldman analysis: the state court ruling must have actually caused the injury alleged in order for the doctrine to remove jurisdiction from the federal court. See Davani, 434 F.3d at 719; see also Martin v. Ball, 2009 WL 1637797, *2 (4th Cir. 2009) (unreported) ("Rooker-Feldman does not apply because Plaintiffs' injuries were not caused by the state court judgment"). The Fourth Circuit has instructed that the hypothetical scenarios set forth by the Second Circuit in Hoblock v. Albany County Bd. of Elections, 422 F.3d 77 (2d Cir. 2005), are useful in understanding the post-Exxon Rooker-Feldman doctrine:

> Suppose a plaintiff sues his employer in state court for violating ... anti-discrimination law and ... loses. If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination. The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by Rooker-Feldman, of the state-court judgment.

Davani, 434 F.3d at 719 (quoting Hoblock, 422 F.3d at 87-88).

19

The parallels between Hoblock and this case are clear: the plaintiffs in Hoblock brought claims similar to Smith's, alleging racial discrimination in the tallying of absentee ballots, and lost in New York state court. Hoblock, See 422 F.3d at 80-81. The plaintiffs then filed a § 1983 suit in federal court, alleging a violation based on the same facts. See id. The Second Circuit held that the Rooker-Feldman doctrine did not remove jurisdiction from the federal court, because the injury of which they complained was not caused by the state court judgment itself, but rather by the facts underlying the suit in state court. See id. at 83.

While the Plaintiff does not mention the state court proceedings in his Amended Complaint, the gravamen of that complaint is clearly the decision to prohibit him from registering to vote - the facts underlying the state litigation. (See Third Am. Compl. at ¶¶ 3-5.) Smith's initial Complaint, however, was composed and filed as an attachment to his Motion for Leave to Proceed in Forma Pauperis, on December 8, 2008.[6] The state court adjudication did not occur until December 10, 2008. (Showalter Ex. 1.) Therefore, Smith's Complaint could not

---

[6] Smith's complaint was not formally filed as a separate, operative document until January 9, 2009, when his Motion for Leave to Proceed in Forma Pauperis was granted. See Keith v. Heckler, 603 F.Supp. 150, 156-57 (D.C.Va. 1985).

20

have been based on an injury caused by state court adjudication because that adjudication had not yet occurred. Thus, the Rooker-Feldman doctrine does not act to bar the suit for two distinct, but interconnected, reasons: first, because Smith's state court litigation had not concluded at the time of the filing of the federal action; second, because the injury of which he complains was not caused by the state court judgment itself. See Field Auto, 476 F.Supp.2d at 551.

Furthermore, invalidation of the state judgment is not necessary to the resolution of this case in Smith's favor. The state Circuit Court found that Smith had insufficiently completed the registration forms, and, therefore, that the denial of his attempt to register was valid. (Showalter Ex. 1.) Smith's claim, cast in the light most favorable to him, is that the forms themselves, and the accompanying requirement that his claim be denied, are unconstitutional. Therefore, it is entirely possible that the state court came to the correct conclusion under the state laws and regulations as they currently exist, but that the laws and regulations that were the basis for that conclusion, along with the actions of the state officials in enforcing them, violated Smith's rights under the Voting Rights Act and Fifteenth Amendment.

Indeed, the Fourth Circuit recently has decided a case under this rationale. <u>See</u> <u>Adkins v. Rumsfeld</u>, 464 F.3d 456, 464 (4th Cir. 2006). In <u>Adkins</u>, a state court found in favor of the defendants under the Uniformed Services Former Spouses' Protection Act, which set forth various rules respecting the treatment of military spouses during divorce proceedings. <u>Id.</u> at 461-62. The plaintiffs then brought an action in federal court challenging the constitutionality of that act. <u>See</u> <u>id.</u> at 463. The Fourth Circuit denied the defendants' argument that <u>Rooker-Feldman</u> acted to remove the district court's jurisdiction, because a decision that the Act itself was unconstitutional would not be an effective appellate review of a state court decision correctly decided under the Act. <u>See</u> <u>id.</u> at 464.

Smith's case is, perhaps, the paradigmatic example of an instance in which the plaintiff complains of "a prior injury that the state court failed to remedy" rather than an injury caused by the state court judgment itself. <u>See</u> <u>Field Auto</u>, 476 F.Supp.2d at 551. As such, even assuming that the timing issue did not render the <u>Rooker-Feldman</u> doctrine inapplicable, the subject matter of this case is not amenable to <u>Rooker-Feldman</u> analysis.[7]

---

[7] The nonapplicability of the <u>Rooker-Feldman</u> doctrine does not affect the ability of a federal court to dispose of an action or

22

## E. Leave to Amend

Smith has not explicitly requested leave to amend his Third Amended Complaint in the face of the Defendants motions to dismiss. However, the Fourth Circuit has stated that a court should consider granting plaintiffs, particularly <u>pro</u> <u>se</u> plaintiffs, leave to amend if it dismisses a complaint based on Fed. R. Civ. P. 12(b)(6). <u>See</u> <u>Ostrzenski v. Seigel</u>, 177 F.3d 245, 252-53 (4th Cir. 1999).

Fed. R. Civ. P. 15(a)(2) provides that a defendant should be granted leave to amend its pleading "when justice so requires." Leave should be granted absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [or] futility of the amendment." <u>Ward Elec. Serv. v. First Commercial Bank</u>, 819 F.2d 496, 497 (4th Cir. 1987) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

There is no indication of undue delay, bad faith, or a dilatory motive on the part of Smith. However, leave to amend

---

issue on <u>res judicata</u>, comity, or abstention grounds. <u>See</u> <u>Exxon</u>, 544 U.S. at 292-93. None of the Defendants have raised any of these issues, however, and the Plaintiff's action will be dismissed on other grounds; therefore, the Court need not address the issues of <u>res judicata</u>, comity, or abstention at this time.

will be denied to Smith on the basis of futility. An amendment is futile if it would "fail[] to satisfy the requirements of the federal rules" or if it "is clearly insufficient or frivolous on its face." U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (quoting United States ex rel. Fowler v. Caremark RX, LLC, 496 F.3d 730, 740 (7th Cir. 2007)); Johnson v. Oroweat Foods Co., 785 F.2d 503, 510 (4th Cir. 1986).

As explained above, most of the relevant defendants have constitutional immunity from Smith's claims for monetary damages. Furthermore, Smith has provided no facts indicating that a violation of his rights under the Constitution, 18 U.S.C. §§ 241, 242, 1584 and 1589, or the Voting Rights Act has occurred. Therefore, the failure of his claim is no mere technical failure in pleading, but is rather a result of the fact that no actionable violation of his rights has occurred. Finally, Smith has already been given leave to amend his Complaint several times, and has failed to create a pleading that can withstand the scrutiny of Fed. R. Civ. P. 12(b)(6). Accordingly, further leave to amend the Complaint will be denied as futile. See Wilson, 525 F.3d at 376.

### III. CONCLUSION

For the foregoing reasons, the Defendants' MOTIONS TO DISMISS (Docket No. 36, 49, and 42) will be granted to the

24

extent that they seek dismissal under Fed. R. Civ. P. 12(b)(6) and denied to the extent that they are brought under Fed. R. Civ. P. 12(b)(1).

The Clerk is directed to send a copy of this Memorandum Opinion to the plaintiff.

It is so ORDERED.

_____ /s/        _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  July 15, 2009